**SO ORDERED.**

**SIGNED August 20, 2019.**



_____
**STEPHEN D. WHEELIS
UNITED STATES BANKRUPTCY JUDGE**
_____

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION**

**IN RE: ROBERT LOUIS GREEN**                                                **CASE NO. 18-80768**
      **MICHELLE LAROUE GREEN**

### REASONS FOR DECISION ON CONFIRMATION OF CHAPTER 13 PLAN

      Robert and Michelle Green are above-median debtors who filed a Petition for Relief under Chapter 13 and Chapter 13 Plan on July 31, 2018. Before filing this case, Robert Green was a self-employed contractor who generated an $8,000 per month income. According to the Statement of Financial Affairs, the debtors went from having a gross income of $709,787 in 2017, to approximately $62,325 for the first seven months of 2018.[1] Just three months after the case was filed, Mr. Green obtained new employment as an offshore worker making substantially less.[2] Michelle Green is a child welfare supervisor for the State of Louisiana, whose income after deductions added $2,465.95 to the household income per month.[3] Availing themselves of the protection of the Bankruptcy Code, these Debtors modified their lifestyle to surrender high dollar assets while proposing a plan to keep the family home, some furniture and one hunting vehicle. It is this last item of collateral, the Plan treatment of a debt secured by a 2014 Polaris Ranger with a stipulated value of $5,000, that appears to be the only impediment to confirmation of the Plan. The Chapter 13 Trustee argues that the Debtors are not in good faith because the Plan proposes to retain the 2014 Polaris.

---

[1] ECF No. 1, Statement of Financial Affairs, p.48.
[2] ECF No. 23, Chapter 13 Trustee's Objection to Confirmation; ECF No. 61, Amended Schedule I, p.23.
[3] ECF No. 1, Schedule I, p.39.

**Findings of Fact**

When the case was filed, the Greens owned a home, two acres of land in another parish, a 2018 GMC Truck, a 2017 GMC Truck and a 2008 Saturn Vue.[4] The Debtors also owned a 2017 Avis Utility Trailer valued at $1,500, a 2014 Polaris RZR valued at $4,000, a 2016 Polaris Ranger valued at $12,000, and a 2016 Coachman Camper valued at $35,000. All the foregoing collateral, except for the Saturn Vue and the Avis Utility Trailer, secured debts to various banks, on which the debtors were making monthly payments. The calculation of debtors' disposable income on Official Form 122C-2 deducts the payments made on these debts and other allowed expenses from their income to show a monthly disposable income of $2,239.81.[5]

The Original Plan proposed debtors would make monthly plan payments of $4,050. Debtors would keep the home but surrender the additional two acres of land. All other secured collateral would be retained and treated in the plan, and unsecured creditors would receive $18,498, about 27.6% payment. The Chapter 13 Trustee objected, asserting *inter alia* that the plan was not proposed in good faith because it provided for payment of items that are not reasonably necessary for the maintenance or support of the debtor(s) or dependents of the debtor(s) under 11 U.S.C. § 1325(b)(2)(A)(i), namely, $472.94 per month to the lienholder for the Coachman Camper; lot rent for that camper of $350.00; and $4,000 payment over the life of the plan on the secured debt for the 2014 Polaris RZR.[6] The Trustee's Objection asserted the plan failed to commit all disposable income to the unsecured creditors as required by 11 U.S.C. § 1325(b)(1)(B), because Line 45 of form 122C-2 shows $2,239.81, over 60 months, would result in $134,388.60 in payments to the unsecured class.[7]

In response to the objections of the secured creditors as to the treatment of their claims, the Trustee's Objection and the debtors' reduction in income, the Greens filed an Amended Plan, wherein they proposed to reduce the payments from the $4,050 made in total for the first three months to $300 for the remaining 57 months. To make this feasible, they retained only the home, some household goods and the 2014 Polaris Ranger, surrendering the two late model GMC trucks, the camper, the two acres and the 2016 Polaris Ranger. The total value of newly surrendered collateral was over $200,000.[8]

The Trustee filed the same Objection, alleging the plan was not filed in good faith because it provided for payment of the camper and the 2014 Polaris, which did not consider the fact that the camper

---

[4] ECF No. 1, Schedule A/B, p.9-10.
[5] ECF No. 1, Form 122c, p.78.
[6] ECF No. 23, Chapter 13 Trustee's Objection to Confirmation of Plan.
[7] *Id*.
[8] ECF No. 30, Amended Chapter 13 Plan.

had been surrendered. The new Objection repeated verbatim the original, except for noting that the reduction in plan payments changed the calculation of payments to unsecured creditors, who would be paid $6,190 under the Amended Plan.[9] Meanwhile, because the debtors were surrendering the two trucks, for which they would have otherwise paid over $155,000 under the original plan, they filed with the Amended Plan a Motion to Incur Secured Debt to replace the two surrendered vehicles with less expensive ones for a combined debt of $64,000.[10] Neither the Chapter 13 Trustee nor any party objected to the Motion, and it was granted.

Because Mr. Green had not provided proof of his new employment income, the Court gave the debtors more time to provide it to the Trustee and to file an Amended Plan to resolve the pending objections. Although belatedly filed, the amended schedule of combined monthly income showed Robert Green's income was reduced from $8,000 to a net amount of $4,623.94.[11] This reduction results in combined income of $7,184.55, and after Schedule J expenses of $6,884.55, only $300 remains as monthly net income devoted to plan payments.[12]

The Greens appeared in support of confirmation of their Amended Plan on June 27, 2019. After four more Amended Plans, a change in Judges and a year later, all creditor objections having been resolved, the Amended Plan before the Court allows the debtors to keep the family home, household goods, and the 2014 Polaris Ranger. The retention of the Polaris Ranger and the terms of repayment are by agreement with the secured lender. The Amended Plan surrenders all other collateral and pays $6,833.23 to the unsecured class, which is 21% of the $32,350.01 in unsecured claims filed.[13] The unsecured dividend reflects the new amount of disposable income available considering Mr. Green's reduced income, which is $1,833.23, plus an additional $5,000, the value attributed to the 2014 Polaris voluntarily added by the Debtors to overcome the Trustee's Objection.

The Trustee's most recent Report and Recommendation in opposition to confirming this plan continues to show $10,465.95 in combined monthly income for the Greens, rather than the $7,184.55 shown on their amended schedules, and reiterates that the plan is not filed in good faith because the debtors are paying $5,000 over the life of the plan for the 2014 Polaris Ranger. The Report restates the Trustee's disposable income objection under §1325(b)(1)(B): "Ln. 45 shows a positive [current monthly income] of $2,239.81, which over sixty (60) months would result in $134,388.60 required for payment to unsecured

---

[9] ECF No. 38, Chapter 13 Trustee's Objection to Confirmation of Plan.
[10] ECF No. 34, Motion to Incur Secured Debt; ECF No. 78, Memorandum in Support of Debtors' Chapter 13 Plan.
[11] ECF No. 61, Amended Schedule I, p.23.
[12] ECF No. 61, Amended Schedule J, p.26.
[13] ECF No. 73, Amended Plan.

creditors."[14] The pre-hearing brief filed by counsel for the Trustee argues the plan was not filed in good faith as required by 11 U.S.C. § 1325(a)(3) since it retains the Polaris Ranger. But as to the disposable income objection under §1325(b), it acknowledges the debtor's change in circumstances and states:

> **[T]he Trustee is not asking the Court to require that Debtors to pay the full [current monthly income] to the general unsecured creditors. Instead, the Trustee seeks only to have the projected disposable income available under the current budget, that Debtors seek to use for a Polaris RZR ($5,000.00 plus interest), and instead utilize those funds to pay the estate's general unsecured.**[15]

The Debtor's pre- and post- hearing briefs argue that the Debtors' change in circumstances and the amount of collateral surrendered satisfies the good faith requirement under the "totality of the circumstances" test, especially considering the encumbered asset would not be liquidated in a Chapter 7 case and would generate nothing for the unsecured creditors. Debtors further argue that the disposable income objection is satisfied, because the plan adds $5,000 to the case liquidation value required to be paid to the unsecured class, for a total of $6,833.23 to be paid to unsecured creditors in exchange for being allowed to keep the Polaris. In his Supplemental Memorandum, the Trustee now alleges that Debtors must pay to the general unsecured creditors the amount designated to pay the lender secured by the 2014 Polaris, apparently in addition to the $5,000 the Debtors provided.[16]

**Law and Analysis**

**Whether the Amended Plan satisfies the good faith requirement.**

Section 1325(a)(3) of the Bankruptcy Code states that "the court shall confirm a plan if ... the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). This provision allows the court to prevent the misuse the bankruptcy process to delay creditors without possible benefit or to achieve a reprehensible purpose by manipulating bankruptcy law." *In re Stanley*, 224 F. App'x 343, 346 (5th Cir. 2007). Good faith is evaluated in the United States Fifth Circuit under a "totality of the circumstances" test, by which the Court considers the following factors:

(1) the reasonableness of the proposed repayment plan,
(2) whether the plan shows an attempt to abuse the spirit of the bankruptcy code,
(3) whether the debtor genuinely intends to effectuate the plan,
(4) whether there is any evidence of misrepresentation, unfair manipulation, or other inequities,

---

[14] ECF Nos. 76 and 82, Trustee's Report and Recommendation.
[15] ECF No. 77, Trustee's Memorandum in Support of Objection to Plan Confirmation, p.6.
[16] ECF No. 80, Trustee Supplemental Memorandum in Support of Objection to Confirmation, p.3.

(5) whether the filing of the case was part of an underlying scheme of fraud with an intent not to pay,
(6) whether the plan reflects the debtor's ability to pay, and
(7) whether a creditor has objected to the plan.

*Id*. Applying these factors to the Green's case, the Amended Plans that follow the Original are reasonable in that they reflect the Debtors' steady adjustment to the loss of income once generated by a successful self-employment to the more reliable, yet less lucrative, wage earner position. The surrender of luxury trucks, land and other expensive items, combined with the motion to replace the vehicles with more reasonably priced transportation to and from work, is evidence of their sincere attempt to reorganize under a feasible plan to repay all creditors more than they would have received in a Chapter 7 liquidation. There is no allegation or evidence that these debtors engaged in misrepresentation, fraud or delay. The Greens readjusted the Plan and proposed surrender of collateral with the First Amended Plan and worked to resolve all creditor objections. Moreover, the Greens are current on all plan payments. The Court is satisfied that the "totality of the circumstances" indicate the *Stanley* factors have been met to the benefit of the Debtors. *Id.*

The Court notes and compares the Greens' retention of the Polaris Ranger to a recent bankruptcy case where "the court predicated a lack of good faith largely on the debtors' retention of a 1998 model fishing boat, together with motor and trailer, which served as partial collateral for a loan the debtors are paying off through the plan. The court considered this inequitable in a plan that was then estimated to yield only a 4% dividend on unsecured debt." *Matter of Booker*, 753 F. App'x 316, 317–18 (5th Cir. 2019). In *Booker*, the bankruptcy court *sua sponte* required the debtor to surrender all collateral for the loan including the boat and its equipment, three TVs and a riding lawnmower, to the benefit of unsecured creditors. In employing the totality of the circumstances test, the Fifth Circuit specifically noted that the secured creditor on the boat had no objection to its plan treatment, as is the case here, and reversed the bankruptcy court's finding of a lack of good faith in proposing a plan that pays for the secured collateral. *Id.*

Likewise, this Court finds that without more, the Chapter 13 Trustee cannot predicate a lack of good faith, or assume the plan is not proposed in good faith, simply because the Debtors retain a fully encumbered asset especially when the Debtors have added the equivalent of the collateral value to the unsecured distribution. When evaluated as a whole, this Court finds the debtors have demonstrated good faith in surrendering over $200,000 in secured collateral to propose a Plan that pays all creditors much more than they would receive in a Chapter 7 liquidation over the term of the plan.

**Whether the debtors committed all disposable income to the Plan.**

When the Trustee or an unsecured creditor objects to confirmation of the plan, the Court may not confirm the plan unless, as of the effective date of the plan, the claims are paid their full value or "(B) the plan provides that all of the debtor's *projected disposable income* to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(emphasis supplied) (West).

The Trustee's Objection to this plan alleges that the debtors have failed to commit all their disposable income to the unsecured creditors because Official Form 122C-2, filed by the debtors with the Petition, "shows a positive [current monthly income] of $2,239.81, which over sixty (60) months would result in $134,388.60 required for payment to unsecured creditors."[17] That figure is an average of pre-petition monthly disposable income multiplied by the number of months in a debtor's plan, not the amount required to pay claims their full value in this case.

The above-median debtor's disposable income calculation on Official Form 122C "may well differ from the debtor's actual disposable income reflected on schedules I and J." *In re Nowlin*, 576 F.3d 258, 262 (5th Cir. 2009). In calculating "*projected* disposable income," the amount on Official Form 122C-2 "serves as the starting point," but this figure may be rebutted by evidence of a change in the debtor's circumstances. *Id.* at 266; *See In re Lanning*, 545 F.3d 1269, 1278-1279 (2008), aff'd by *Hamilton v. Lanning*, 560 U.S. 505, 130 S. Ct. 2464, 177 L. Ed. 2d 23 (2010). The mechanical interpretation was rejected in favor of a forward-looking approach (that takes into account actual or virtually certain changes in the debtors' income) by the Supreme Court in *Hamilton v. Lanning*:

> **In cases in which a debtor's disposable income during the 6–month lookback period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended. In cases in which the debtor's disposable income is higher during the plan period, the mechanical approach would deny creditors payments that the debtor could easily make. And where, as in the present case, the debtor's disposable income during the plan period is substantially lower, the mechanical approach would deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements.**

*Hamilton v. Lanning*, 560 U.S. 505, 520–21, 130 S. Ct. 2464, 2475–76, 177 L. Ed. 2d 23 (2010).

---

[17] ECF No. 71, Amended Objection to Confirmation of Plan; ECF No. 76, Trustee's Report and Recommendation. This is misstated in the Objection and Report, as the "CMI" or Current Monthly Income is calculated on Official Form 122C-1 and is the average income for the six months prior to petition filing. The $2,239.81 is the "disposable income" calculated on Official Form 122C-2, which is derived by subtracting statutorily allowed expenses from the Current Monthly Income. *See* 11 U.S.C. §§ 101(10A) and 707(b)(2).

Three months into this case, the debtors' actual monthly income was reduced by $3,281.40.[18] This loss of income is greater than the original calculation of what was disposable income on Official Form 122C-2 of $2,239.81. Disposable income is what remains after allowed expenses and payments on secured debt. 11 U.S.C. §§ 1325(b)(2-3) and 707(b)(2). This means that the Greens not only do not have the funds that were "disposable" but also suffered a loss in the amount needed to pay secured debts and other allowed expenses. This is a significant and actual change that warrants a different calculation of projected disposable income than the mechanical interpretation allows.

The Trustee's post-hearing brief deftly departs from its Amended Objection and Report that insisted upon a mechanical determination of projected disposable income as the current monthly income as reported on the official form. In doing so, the Trustee concedes that the Greens' Amended Schedules I and J are the best evidence of the amount they can pay toward the plan, but in making this concession, the Trustee does not forfeit the disposable income objection, stating, "the Trustee seeks only to have the projected disposable income available under the current budget, that Debtors seek to use for the Polaris RZR ($5,000.00 plus interest), and instead utilize those funds to pay the estate's general unsecured."[19] In the pre-hearing brief, the Trustee argued, "The income Debtors seek to utilize for the Polaris RZR has already been earmarked for the general unsecured creditors under the Bankruptcy Code and the plan should provide as such."[20]

What is "the projected disposable income under the current budget" to which the Trustee refers as "earmarked" for the unsecured class? The Court notes that *Lanning* "did not sacrifice the means test in favor of schedules I and J in every case, or validate a reversion to [the] pre-BAPCPA practice" of calculating a debtor's projected disposable income based on figures in Schedules I and J. *In re Smith*, 549 B.R. 188, 196 (Bankr. N.D. Miss. 2016). But the Court cannot find any authority in the Code and the Trustee did not cite any authority for "earmarking" portions of the plan payment in favor of the unsecured class over the payment of an allowed secured claim.

Rather, § 1325(b)(2) defines "disposable income" as the current monthly income (with child support income excepted) "less amounts reasonably necessary to be expended" for "maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. 1325(b)(2) (West). However, the "amounts reasonably necessary to be expended" include deduction of the payments on secured debts that will be made by debtors during the term of the plan under §1325(b)(3) and §707(b)(2)(iii). *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 65, 131 S. Ct. 716, 722, 178 L. Ed. 2d 603 (2011)("Under the means test, a debtor calculating his "reasonably necessary" expenses is directed to claim allowances for defined living expenses,

---

[18] *Cf.* ECF No. 1, Schedule I with ECF No. 61, Schedule I.
[19] ECF No. 80, Trustee's Supplemental Memorandum in Support of Objection to Plan Confirmation, p.3.
[20] ECF No. 77, Trustee's Memorandum in Support of Objection to Plan Confirmation, p.6.

7

as well as for secured and priority debt."). Thus, the disposable income is the amount left over *after* the expenses and payments that are permitted by the means test under §707(b)(2).

The Trustee essentially asks this Court to require that payments on debts for allowed secured claims be read out of the deductions in calculating disposable income under 11 U.S.C. §707(b)(2)(iii), if the asset retained in the Plan is not "for the maintenance or support of the debtor or dependent" under §1325(b)(2)(A)(1). This is a circular strategy for increasing a dividend to the unsecured class that not only circumvents the Code's basic waterfall structure for payment of secured claims before unsecured claims under §§ 726 and 1326 but also rewrites the means test calculation under §707(b)(2) and renders meaningless § 1325(b)(3)'s reference to § 707(b)(2) as the determination of what is "reasonably necessary" for above-median debtors.

Prior to BAPCPA, bankruptcy courts had the discretion to determine whether debtors' expenses for secured claims were reasonable and necessary for above and below median debtors. However, "§ 1325(b)(3) provides a clear indication that Congress intended a departure from such pre-BAPCPA practice with respect to above-median-income debtors." *Baud v. Carroll*, 634 F.3d 327, 347–48 (6th Cir. 2011). This finding is supported by "a majority of courts have [who have] held that above-median-income debtors may deduct ongoing monthly payments on secured debt in accordance with the formula set forth in § 707(b)(2)(A)(iii) for property that debtors intend as of the date of confirmation to retain, regardless of whether the payments are subjectively reasonably necessary to be expended for the maintenance or support of the debtors or the debtors' dependents." *Id*. Courts have even held with respect to secured debt on collateral construed as a "luxury item," or for an excessive number of vehicles, it is the debtor as plan proponent who determines its necessity:

> Section 707(b)(2)(A)(iii) allows deduction as an expense of payments on secured debt, *unless the debtor determines that payment on the outstanding amount of the secured claim is unnecessary by either surrendering the property or avoiding the lien securing the claim*. The bankruptcy court did not err in allowing debtors in calculating their disposable income to deduct their secured debt payments on the six vehicles that they intend to retain.

*In re Welsh*, 465 B.R. 843, 851 (B.A.P. 9th Cir. 2012), aff'd, 711 F.3d 1120 (9th Cir. 2013)(emphasis supplied). "In enacting the BAPCPA, Congress did not see fit to limit or qualify the kinds of secured payments that are subtracted from current monthly income to reach a disposable income figure." *In re Welsh,* 711 F.3d 1120, 1135 (9th Cir. 2013). While this Court does not rule or imply that Debtors have "carte blanche" regarding the retention of collateral, the facts of each case are determinative of the

8

satisfaction of the *Stanley* "good faith" factors and the mathematical calculation of disposable income. *In re Stanley*, 224 F. App'x 343.

Here, the Greens have not attempted to keep six vehicles as the debtors in *Welsh*, but as noted above, have exercised the rights of plan proponents to surrender more expensive collateral in exchange for keeping less expensive items. This Court cannot read §1325(b)(2) in a way that renders the rest of the statute or the related Code provisions meaningless. The parties do not dispute that the $300 proposed plan payment is the most debtors can afford, which over the plan term, will yield a 21% dividend ($6,833.23) to the unsecured class. Therefore, the Court finds the Debtors have satisfied their burden of showing the plan commits all disposable income under 11 U.S.C. § 1325(b).

## Conclusion

Chapter 13 is not a liquidation chapter. Unlike bankruptcy debtors who file under Chapter 7 and must liquidate their assets, Chapter 13 debtors are permitted to keep their property subject to a court-approved plan under which they agree to pay creditors out of their future income. *In re Ragos*, 700 F.3d 220, 221 (5th Cir. 2012). Whether couched as an objection on grounds of "bad faith" or as a failure to commit all disposable income to the Plan, the Trustee's Objection to the retention of secured collateral must be overruled. There is no evidence that the Debtors have acted in bad faith, and ample evidence in the record to the contrary. This Court cannot read §1325(b)(2) in a way that renders the rest of the statute or the related Code provisions meaningless. The Amended Plan fully complies with the Bankruptcy Code.[21] The Court is reminded of the Fifth Circuit's words, "it is apparent that Debtors are not in bad faith merely for doing what the Code permits them to do." *In re Ragos*, 700 F.3d 220, 227 (5th Cir. 2012). Finding the debtors have satisfied the burden of good faith under § 1325(a)(3) and have committed all of their disposable income to the Amended Plan before the Court, the Objection of the Chapter 13 Trustee is overruled and the Amended Plan (ECF No. 73) will be confirmed. In accordance with these Reasons, the Chapter 13 Trustee is directed to submit an Order of Confirmation of the Amended Plan.

# # #

NOT FOR PUBLICATION

---

[21] ECF No. 73, Amended Plan.